## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

CHRISTINA LADON NELSON,    )
    )        **4:10CV3197**
        **Plaintiff,**    )
    )
    **v.**    )
    )        **ORDER**
MICHAEL J. ASTRUE,    )
**Commissioner of Social Security,**    )
    )
        **Defendant.**    )

This matter is before the Court on the denial, initially and on reconsideration, of the plaintiff's application for disability insurance benefits under the Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*[1] The Court has carefully considered the record (AR.) (Filing Nos. 22 and 23) and the parties' briefs (Filing Nos. 28, 31).

## PROCEDURAL BACKGROUND

The plaintiff, Christina Ladon Nelson[2] (Nelson), filed her applications for disability insurance benefits and SSI on February 1, 2007 (AR. 153-166).[3] The Social Security Administration (SSA) denied benefits initially (AR. 76-79, 81-84) and on reconsideration (AR. 87-90, 91-94). Nelson requested a review and a hearing before an administrative law judge (ALJ) (AR. 95). On September 21, 2009, Nelson and vocational expert (VE) Judith L. Najarian, appeared and testified at a video hearing before ALJ Michael J. Kopicki (AR. 30-60). Nelson's attorney also appeared at the hearing. On November 25, 2009, the ALJ issued his written opinion that Nelson has not been under a disability since August 2, 1998, the alleged onset date (AR. 10-24). On August 10, 2010, the Appeals Council denied

---

[1]The parties consented to jurisdiction by a United States Magistrate Judge pursuant to to 28 U.S.C. § 636(c). **See** Filing No. 27.

[2]The documentation in the AR also refers to the plaintiff by the names Christina Ladon Millard and Christina Galda.

[3]The citations to the Administrative Record refer to the page numbers appearing at the bottom right-hand corner.

Nelson's request for review (AR. 1-3).  Therefore, the ALJ's November 25, 2009, decision constitutes the Commissioner's final decision subject to judicial review.

Nelson argues the ALJ's hypotheticals to the VE were "legally inadequate" because (1) the ALJ omitted "the impact of pain sustained by the plaintiff in performing ordinary work and or household duties, the existence of pain was supported by the evidence"; and (2) the ALJ failed to include Nelson's "severe impairments of bipolar disorder, dissociative syndrome, anxiety, seizure disorder, sequella of cervical fractures impacting physical functional abilities."  **See** Filing No. 28 - Brief p. 4.  Nelson further argues the ALJ "equated the ability of [Nelson] to perform some household duties as the legal equivalent of the capacity for full time competitive work, which is contrary to law."  ***Id.***

## FACTUAL BACKGROUND

Nelson alleges she has been disabled since August 2, 1998[4] (AR. 36, 153), as a result of bipolar disorder, epilepsy, schizoaffective disorder, dyslexia, disassociative disorder, anxiety, hearing loss, and back and foot pain (AR. 36, 229).  Nelson was born August 1, 1982, and was 16 years old on her alleged onset date of August 2, 1998, and 27 years old on the date of her hearing before the ALJ (AR. 153).  She is a high school graduate (AR. 35).  Nelson has worked sporadically in numerous positions including waitress, cashier, and retail stocker (AR. 36, 230).

### A.    Medical Records

In October 2002, Nelson saw Robert A. Kooken, Ph.D. (Dr. Kooken), for a neuropsychological examination (AR. 270-278).  Nelson was referred to Dr. Kooken "in "order to determine her current cognitive capacity and psychological condition" following a serious motor vehicle accident on August 2, 2002 (AR. 270).  Since the accident, Nelson had experienced difficulty reading and memory problems (AR. 270).  Nelson reported a history of bipolar illness and psychiatric hospitalizations, but denied current symptoms of

---

[4]In her answers to interrogatories, Nelson lists August 2, 2002, as the date she was first unable to work due to physical or mental problems (AR. 182).  However, she did not indicate she was amending her onset date, and at the hearing before the ALJ, Nelson agreed she became disabled and unable to work as of August 2, 1998 (AR. 36).  Therefore, the court will treat August 2, 1998, as Nelson's alleged onset date.

depression, hypomania, and anxiety (AR. 270).  Nelson reported being hospitalized for psychiatric reasons more than twenty times in her past, including a year-long stay at a state psychiatric hospital in Provo, Utah, at age 15, at which time she experienced auditory command hallucinations (AR. 271).  She stated she has not experienced auditory or visual hallucinations in the recent past (AR. 271).  She reported never having used recreational drugs or alcohol (AR. 271).  She described numerous suicide attempts, physical fights at school and with her parents (AR. 271-272).  Nelson denied manic episodes or dramatic mood swings (AR. 272).  Dr. Kooken observed no deficits in information processing speed or difficulty understanding complex verbalizations or instructions (AR. 273).  Nelson's Full Scale IQ of 93 is in the average range of intellectual functioning (AR. 274).  Nelson demonstrated severe dyslexia as well as other difficulties with writing and spelling (AR. 275).  Nelson showed mild impairment in her working memory, defined as "the ability to hold information in short-term memory while performing a simultaneous/competing mental operation" (AR. 277).  Dr. Kooken concluded that the examination "revealed symptoms typical of persons who are suffering from Gerstmann's syndrome . . . and persons with parietal lobe damage" (AR. 277).  Dr. Kooken further opined, "competitive employment would be impossible for her at this time.  She would have difficulty learning new job tasks and performing any job that required reading and writing.  Repeat neuropsychological examination over time will determine if she can work in the future" (AR. 278).

A November 19, 2004, computed tomography (CT) scan of Nelson's head was normal (AR. 289).  A November 25, 2004, magnetic resonance imaging (MRI) scan of her cervical spine showed a healed C2 fracture with "very mild central disc protrusion" at C5-6, and "no evidence of nerve root impingement or cord impingement" (AR. 288).  The results from an electroencephalogram (EEG) done on August 18, 2006, were normal with no epileptiform activity seen (AR. 439-440, 537-538).

On February 20, 2007, in response to questions posed in the process of her disability application, Nelson indicated she was currently taking Keppra for her seizures as prescribed by Dr. Shah and Dr. Gosnell (AR. 225).  She reported that during a seizure she may "fall and [b]lackout" (AR. 226).  Nelson described experiencing a light aura and feelings of illness and weakness before a seizure, and confusion, sleepiness, and trouble

walking following a seizure (AR. 226).  She estimated the frequency of her seizures as once a month, with her last being in December 2006 (AR. 225-226).  She further stated the seizures are "more under control with medication" (AR. 226).

On February 21, 2007, Nelson completed a Supplemental Disability Report detailing her activities (AR. 220-223).  Nelson reported doing household chores including washing dishes and laundry, dusting, vacuuming, and scooping light snow (AR. 220-221).  She wrote that she supervises her children on a daily basis, bathes them, and prepares their meals (AR. 221).  She drives, but not very often (AR. 221).  She mainly relies on her family for transportation, and she does her own errands, described as shopping and going to appointments, but usually has help (AR. 221).  She socializes only with her parents, who help her manage her money (AR. 220, 222).  She has trouble sleeping and has anxiety reactions, that she described lasting an hour and occurring at least once a week, caused by stress, large crowds and loud noises (AR. 222-223).  Nelson listed her medications as Keppra, Ativan, Iodine, Clariton, Cymbalta, Risperdal, Ambien, and Zantac, which are administered by a nurse who comes to her home (AR. 222).

In a letter dated March 6, 2007, Lori Jensen, Licensed Clinical Social Worker (LCSW) (Ms. Jensen), wrote that she had seen Nelson on eight occasions beginning in January 2007 for individual and family therapy (AR. 443).  She noted she had "very limited information to help with obtaining evidence for her disability claim" (AR. 443).  Ms. Jensen went on to comment that Nelson  was "very unstable in her mood and level of functioning for her self-care as well as her family" and "claims problems with her medication as well as significant personal and emotional problems" (AR. 443).

On March 8, 2007, Hemanth K. Bhimasani, M.D. (Dr. Bhimasani), of the Great Plains Regional Medical Center completed a preliminary Inpatient Psychiatric Diagnostic Evaluation on Nelson (AR. 597-601).  Nelson was admitted into the hospital on a voluntary basis after being seen in the emergency room (ER) (AR. 597).  Her parents apparently brought her in after she fell on broken glass in her home and reported that her ex-husband had given her "some pills" for a headache (AR. 597).  Nelson presented at the ER confused and groggy, with a blood alcohol level of 0.19 (AR. 597, 599).  ER staff thought she was delusional and paranoid (AR. 597).  Nelson told Dr. Bhimasani she had been

diagnosed with bipolar illness and schizophrenia, "although she could not verify any symptoms pertinent to [schizophrenia]" (AR. 598).  Nelson also reported she did not smoke and she had been drinking two times a week for the past six weeks; however, Nelson's father stated she had been "drinking on and off for the past four to five years and more recently everyday" (AR. 598).  Nelson told Dr. Bhimasani that her medications were being managed by her physician and she was seeing a therapist (AR. 600).  Nelson was discharged against medical advice (AR. 601).

From March 29, 2007, to May 20, 2009, Nelson was seen on numerous occasions at Family Medical Associates (FMA) by Wendy Gosnell, M.D. (Dr. Gosnell), and others, for various complaints of migraines, seizures, as well as back, shoulder, and neck pain (AR. 585-590).  The documentation from FMA includes a note from April 10, 2007, in which Dr. Gosnell indicated Nelson "wanted Ambien CR samples but just picked up Ambien at the pharmacy" (AR. 590).  Dr. Gosnell noted "[s]ounds like she's been very manipulative at the pharmacy" (AR. 590).  Notes from April 21, 2007, indicated multiple calls to the office by Nelson seeking pain medication for a headache caused by a fall, and Nelson's refusal to follow medical advice to go to the ER (AR. 589).  The author of the note indicated "I will not call in any narcotics because of the inconsistent stories and the history of a possible head injury" (AR. 589).  On September 15, 2008, Nelson was seen for abdominal pain, vomiting, and diarrhea (AR. 587).  Nelson smelled strongly of alcohol but denied drinking (AR. 587).  A pharmacy check done because of Nelson's past history of drug problems resulted in the discovery that Nelson was getting her prescription of Lorcet filled, 40 at a time, weekly during the past month, and revealed that Nelson also went by the name of Christina Millard (AR. 587).

During a portion of the time she frequented FMA for medical care, Nelson was also seen on several occasions in the office of Douglas States, M.D. (Dr. States) by both Dr. States and Jill McAdam, Certified Physician Assistant (PA-C) from May 16, 2007, to August 27, 2007 (AR. 507-530).  She presented with various complaints including headaches, conjunctivitis, and pain in her arm, back, ear, and abdomen (AR. 507-530).

Nelson participated in a psychological evaluation, including cognitive and psychological testing, with Lisa M. Jones, Ph.D. (Dr. Jones), upon referral from her

protection and safety worker due to the latter's concerns about Nelson's "ability to parent her two young children" (AR. 453-458).  Nelson began the evaluation in January 2007 and completed the psychological testing on May 29, 2007 (AR. 453).  Nelson reported taking Keppra for "some type of seizure disorder" (AR. 454).  She reported being diagnosed with dissociative identity disorder, schizoaffective disorder, and bipolar disorder, and taking Risperdal, Cymbalta, Ativan and Ambien (AR. 454).  Nelson denied tobacco use or any problems with alcohol (AR. 454).  "She reported that she was addicted to heroin when she was 14 years old, but denied any other substance abuse" (AR. 454).  Dr. Jones noted "collateral sources [including Nelson's case worker, therapist, and father] revealed that [Nelson] was abusing alcohol and prescription medications" (AR. 454).  Dr. Jones assessed Nelson's mental status noting poor grooming, poor eye contact, logical but evasive speech, moderately impaired recent and remote memory, unusual thought content, indifferent attitude, and very poor judgment (AR. 455).  Dr. Jones noted Nelson "denied hallucinations, but reported that she has different personalities" (AR. 455).  Nelson had a full scale IQ of 80, putting her in the low average range of intellectual functioning (AR. 456).  The psychological testing indicated a likelihood of a personality disorder and "suggested a moderate tendency towards self-deprecation and a consequent exaggeration of current emotional problems" (AR. 456).  Dr. Jones opined

> [i]t appears as though [Nelson] has recently been in a manic episode and that she has resorted to drinking more and abusing prescription medication.   [She] appears to have experienced some type of neurological damage following her car accident in 2002.   More specifically, her cognitive functioning is highly variable, which is indicative of a learning disorder or head injury.

(AR. 457).  Dr. Jones' recommendations included dual-diagnosis substance abuse treatment and a psychiatric evaluation to "reexamine" Nelson's medications (AR. 457).  Dr. Jones diagnosed Nelson with Bipolar I Disorder, most recent episode manic; alcohol abuse; sedative, hypnotic, or anxiolytic abuse; personality disorder, not otherwise specified

(NOS), with schizoid, avoidant, and depressive features; and assigned a GAF of 45[5] (AR. 458).

Nelson was referred by the Disability Determination Section, Nebraska Department of Education, for a psychological interview with Rebecca Schroeder, Ph.D. (Dr. Schroeder) (AR. 444). Dr. Schroeder conducted the evaluation on May 29, 2007, and prepared a Disability Report (AR. 444-452). Nelson stated she was unable to work "mainly because of her physical problems" including "continual pain from her neck injury," headaches, vision problems, and impaired cognitive processes (AR. 446-447). Nelson described her physical health as good up to the time of her 2002 motor vehicle accident (AR. 446). She reported experiencing seizures after her accident with her last seizure in September 2006 (AR. 446). Nelson stated she "thinks that her seizures are in the past" (AR. 446). Nelson listed her current medical concerns as bad migraine headaches, vision problems, jaw pain, and "continual, throbbing [neck] pain" (AR. 446). Her medications were Risperdal and Cymbalta (AR. 446). Nelson denied ever using any illegal or illicit substances or problems with alcohol (AR. 446). She further denied any current alcohol or tobacco use (AR. 446). Nelson stated she has been in and out of psychiatric care since she was diagnosed with a bipolar condition at age thirteen (AR. 447). She described continued mood swings and difficulty handling stress (AR. 448). Dr. Schroeder noted Nelson also stated she "really does not experience significant mood swings . . . that her mood is usually dysphoric and that she has never experienced any type of manic episode" (AR. 450). After reviewing Nelson's medical records, Dr. Schroeder noted Nelson's frequent visits to Dr. Gosnell's office seeking refills on medication, and the documented concern that Nelson was exaggerating symptoms and "exhibiting drug-seeking behavior" (AR. 450). Review of Nelson's medical records also revealed "some suspicion of drug use" but Dr. Schroeder noted a negative drug screen in February 2007 (AR. 450). Dr. Schroeder determined

---

[5]The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 32-34 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). **See** DSM-IV-TR at 34.

Nelson has difficulty handling stress and some mild restrictions in activities of daily living that may be affected by her depressed mood (AR. 451). However, Dr. Schroeder also opined that Nelson

> does seem to have the ability to maintain social functioning . . . [and] does seem able to sustain concentration and attention needed for at least a short task completion. She seems able to understand and remember short and simple instructions and she appears capable of carrying out instructions under ordinary supervision. She seems able to relate appropriately to coworkers and supervisors and to adapt to changes within her environment.

(AR. 451). Dr. Schroeder opined that Nelson met the criteria of Bipolar II Disorder which is characterized by relatively mild mood swings (AR. 450). Dr. Schroeder stated that Nelson "did not report any symptoms of a dissociative disorder" and "when asked [about] those specific symptoms, [Nelson] did not give any positive responses" (AR. 450). Dr. Schroeder opined that Nelson may have exaggerated her symptoms of cognitive impairment, including problems with memory, problem solving, and thinking (AR. 450). Dr. Schroeder noted Nelson's "cognitive functioning appeared to be within average limits" (AR. 450). Dr. Schroeder diagnosed Nelson with bipolar II disorder, depressed; personality disorder, NOS, with borderline and narcissistic features; and assigned a GAF of 68[6] (AR. 451).

On June 14, 2007, Nelson completed a substance abuse evaluation with Sonia Kounovsky, Licensed Alcohol and Counselor (LADC) (Ms. Kounovsky) (AR. 545-548). Nelson was referred for the evaluation by her social services case worker after Nelson's children had been removed from her home because of domestic violence charges against Nelson's husband (AR. 545). Nelson reported her "problem drinking" began six months prior to the evaluation, when she lost her children (AR. 545). As of May 2007, Nelson was drinking two to three shots of vodka a day, which when combined with her psychiatric medications, had strong effects (AR. 545). She reported last drinking on June 4, 2007,

---

[6]A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. **See** DSM-IV-TR at 34.

when she was arrested for DUI, however, collateral information from her support worker indicated Nelson had been drinking the weekend prior to the evaluation (AR. 545, 547). Nelson reported being hospitalized three time related to her drinking, but denied tobacco or other drug use, prescription drug abuse, as well as any history of other addictions (AR. 545).   Nelson told  Ms. Kounovsky she was diagnosed as bipolar at age fifteen, but that her current diagnosis was not bipolar, but rather dissociative disorder, a pychosis disorder and anxiety (AR. 545).  Ms. Kounovsky noted Nelson was "locked in to one pharmacy due to past prescription abuse" and that her father keeps her medications and assists her with the correct dosages  (AR. 547).   Nelson reported having a history of seizures but none since the birth of her son (AR. 546).  Ms. Kounvosky found Nelson to be an unreliable historian (AR. 547).  Ms. Kounvosky assigned a GAF of 41 and recommended outpatient treatment "with a dual diagnosis therapist" with "immediate referral to St. Monica's Residential Treatment program" if Nelson is unable to abstain from alcohol or drugs (AR. 547).

Nelson was seen by Linda Decker, Advanced Practice Registered Nurse (APRN) (Ms. Decker), at the Outpatient Psychiatric Office of the Great Plains Regional Medical Center on June 11 and 20, and July 5, 2007, for medication management following a psychiatric inpatient admission (AR. 488-490).   On June 11, 2007, Ms. Decker noted Nelson had recently been in jail for repeatedly dialing 911 (AR. 490).  She noted Nelson's thought processes were jumbled and Nelson reported feeling anxious and angry (AR. 490). Ms. Decker assigned a GAF of 40[7] (AR. 490).   On June 20, 2007, Nelson reported being depressed but Ms. Decker wrote that Nelson was in much better control of her mood and her thought processes were goal directed and linear (AR. 489).  Ms. Decker noted Nelson continued to have problems with impulsive behavior including making calls to 911 (AR. 489).   Ms. Decker again assigned a GAF of 40 (AR. 489).   On July 5, 2007, Nelson returned to see Ms. Decker for medication management (AR. 488).   Ms. Decker noted

---

[7]A GAF of 31 through 40 is characterized by some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home and is failing at school). **See** DSM-IV-TR at 34.

9

Nelson reported being a little depressed the previous day because she was unable to see her children, but overall described her mood as pretty good (AR. 488). Ms. Decker described Nelson as "well controlled" and noted the impulsive behaviors had ceased (AR. 488). Consistent with her previous assessments, Ms. Decker again assigned a GAF of 40 (AR. 488).

On June 21, 2007, Lee Branham, Ph.D. (Dr. Branham), a state agency psychologist, reviewed Nelson's record and completed forms titled "Mental Residual Functional Capacity Assessment" (MRFCA) and "Psychiatric Review Technique" (PRT) (AR. 460-477). In the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Branham rated Nelson as no more than moderately limited in seven of twenty listed activities or abilities, and found no significant limitation in the remaining thirteen (AR. 460-461). He determined Nelson has mild limitations in activities of daily living; moderate limitations in maintaining social functioning, and in maintaining concentration, persistence, or pace; and insufficient evidence of episodes of decompensation (AR. 474). In the functional capacity assessment section of the MRFCA, Dr. Branham wrote "[m]edically determinable impairments are mild cognitive disorder, bipolar disorder vs mood disorder NOS, DA/A [drug/alcohol abuse], and personality [disorder] NOS (borderline and narcissistic)" (AR. 462). Dr. Branham noted that Nelson's responses in the Activities of Daily Living forms indicate anxiety and reduced social contact, but that Nelson cares independently for her children (AR. 462). He further noted daily activity forms completed by others "indicate some difficulty with attention/ concentration and social functioning" (AR. 462). Dr. Branham opined:

> The allegation of bipolar disorder is reasonably supported by [medical records], but we do not have evidence for schizoaffective disorder or a dissociative disorder. Her mood swings may in part be a reflection of her borderline personality traits, or may be [drug and alcohol abuse]-related. . . . [T]he overall pattern of evidence is not consistent with marked psychological limitations.

(AR. 462). Dr. Branham opined Nelson "retains the capacity to handle simple instructions, as well as the other capacities listed above. Findings are the same for DLI of 9/05 and the current time" (AR. 462).

On June 26, 2007, state agency medical consultant Glen Knosp, M.D. (Dr. Knosp), completed a Physical Residual Functional Capacity Assessment (AR. 479-487). Dr. Knosp wrote that Nelson could lift fifty pounds occasionally and twenty-five pounds frequently, and sit, stand, or walk for a total of six hours in an eight-hour workday (AR. 480). He opined Nelson could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps or stairs, and could frequently balance, stoop, kneel, crouch, and crawl (AR. 481). Dr. Knosp further opined Nelson should avoid unprotected heights and hazardous machinery, as well as concentrated exposure to noise and vibration (AR. 483). The form primarily consisted of statements with available check boxes, however, Dr. Knosp also provided notes including a two-page narrative explanation of his opinion (AR. 484-487). Dr. Knosp noted Nelson "has exhibited drug seeking behavior" and found Nelson's complaints of pain "not credible" (AR. 484). Dr. Knosp wrote "[t]here is no evidence of a medial condition onset in 1998" (AR. 486). While Dr. Knosp acknowledged Nelson's medical records indicate a C2 fracture from a 2002 motor vehicle accident, he noted the fracture was well healed with "no nerve root or spinal cord involved and no arthritic build up pressing on the neural structures" (AR. 487). Dr. Knosp noted Nelson's allegations of a seizure disorder are inconsistent with normal MRI, CT scan, and EEG results (AR. 487). Moreover, no seizure activity has been observed by ER staff, Nelson had no visible injuries from her reported falls, and had been noncompliant with seizure medications (AR. 487). Dr. Knosp opined Nelson's seizure disorder diagnosis appears to be based on her subjective information (AR. 487). Dr. Knosp wrote he found "no evidence to confirm hearing loss," that Nelson "does not use an adaptive device for hearing and can participate in normal conversation" (AR. 487). Dr. Knosp further opined:

> [Nelson's] numerous pain complaints are not found to be credible, based on her history of drug seeking behavior, such as requesting Dilaudid (an exceedingly powerful pain medication) for mild pain, her behavior when told narcotics would not be prescribed in the ER, her varying complaints to ER staff, and her presentation of NAD (such as normal vital signs and lack of any significant weight loss despite claiming persistent N&V).

(AR. 487).  He further noted that in 2006 "a nursing agency was getting involved to dispense meds, as some of the pain medication was overused" (AR. 486).  Dr. Knosp concluded that at both the date last insured, September 30, 2005, and the present, June 26, 2007, Nelson "was/is fully capable of performing work activity in the medium range, with proper safety precautions" (AR. 487).

From June 9, 2008, to August 4, 2008, Nelson participated in St. Monica's Short-term Residential Program to address her alcohol abuse (AR. 618-619).  She successfully completed the program and left with recommendations for outpatient treatment, therapy, and psychiatric medication management (AR. 619).

In November 2008, Nelson's substance abuse counselor referred her to Tamara R. Johnson, M.D. (Dr. Johnson), for medication management (AR. 552).  Nelson reported being diagnosed with bipolar disorder, dissociative identity disorder, and post-traumatic stress disorder (PTSD) (AR. 552).  She reported that her current medications, which included Invega, Revia, Atarax, Ambien, and Trazodone, have been helpful (AR. 552).  Nelson described her mood as stable and reported sleeping fairly well, and no hallucinations, depression, or suicidal thinking (AR. 552).  Nelson stated she had been sober for seven months and was currently in outpatient counseling.  She denied any other drug use or abuse (AR. 553).  She was employed at McDonald's (AR. 553).  Dr. Johnson noted Nelson's memory appeared to be very good and she was able to successfully complete the cognitive challenges presented to her to determine her mental status (AR. 553).  Dr. Johnson assigned a GAF of 49 (AR. 553).  When she returned to see Dr. Johnson on February 5, 2009, Nelson reported she was doing well and her children had been returned to her care (AR. 551).

In her responses to Interrogatories on April 27, 2009, Nelson indicated she is unable to work due to her bipolar disorder, which is worse when she experiences stress (AR. 182).  She experiences sharp, throbbing pain in her neck, back, and shoulders on a daily basis (AR. 183).  In addition to her medication, she exercises to help relieve the pain (AR. 184).  She can walk two blocks and stand for thirty minutes to one hour before having to sit or lie down (AR. 185).  She can sit for one hour before having to stand-up or lie down (AR. 185).  She can stand for four hours, walk for two hours, and sit for two hours in an eight hour day,

and can lift five pounds with one hand and fifteen pounds with two hands (AR. 185).  She can perform her own personal hygiene and household chores described as including "vacuuming, dusting, sweeping, washing dishes, scrubbing floors, mowing the lawn, making beds, doing the laundry, [and] cooking" (AR. 187).  She described her average day as taking care of herself and her sons and doing community service (AR. 187).

## B.  Nelson's Testimony

On September 21, 2009, Nelson testified at the administrative hearing before the ALJ (AR. 34-53).  She stated she has two children ages four and two but she currently lives alone (AR. 34-35).  She is a high school graduate (AR. 35).  She receives Medicaid and described her income as death benefits and her father's help (AR. 34).  Nelson briefly described her previous work experience at a gas station, book store, clothing store, and as a waitress (AR. 36).  She described her most recent employment at a fast-food restaurant, where she was asked to leave because of her "dissociate disorder" (AR. 36).

Nelson does household chores, including some of the cooking, cleaning, shopping, and laundry with some assistance from her mother (AR. 43).  She takes care of her own personal hygiene (AR. 43).  Her father takes care of her yard (AR. 43).  She testified her children are in foster care and she has visits with them in her home four times a week (AR. 44).  Her activities with her children include watching cartoons on television, coloring, playing on the floor, and watching them ride their bikes (AR. 44).  She does not socialize outside of her family due to severe social anxiety (AR. 45).  She first testified she has not driven a car since her accident in 2002, but then admitted driving once in 2007 at which time she was cited for DUI (AR. 41, 52-53).  Nelson testified she completed St. Monica's Drug Rehabilitation and has been sober since April 2008 (AR. 39).

Nelson testified she was in a car accident when she broke her C2 and C3 vertebrae which causes pain in her shoulders and neck and causes her neck to tighten so that she cannot turn her head (AR. 42, 52).  She is not on any pain medication but plans to see a pain specialist after having an MRI (AR. 42).  Nelson testified she can walk only two to three blocks before her legs and lower back begin to hurt (AR. 45).  She stated she can stand for approximately an hour and sit for twenty to thirty minutes before experiencing

pain in her back (AR. 45).  She estimated she can lift ten pounds (AR. 45).  In response to her attorney's questions, Nelson testified she experiences problems with pain in her neck and back five or six times a day depending on her activity (AR. 48).  In order to alleviate the pain, which she estimates as a six or higher on a ten-point scale and may last twenty minutes to an hour, she has to sit in her recliner until the muscles "loosen up" (AR. 47 ).  Nelson further testified she wakes up three or four times a night with cramps in her back and legs and must walk around for several minutes to relieve the cramps before she can return to sleep (AR. 50).

Also as a result of her motor vehicle accident, Nelson described complete deafness in her left ear and sixty percent hearing in her right ear (AR. 41).  She described an unsuccessful surgery to remove her jawbone from her left ear but did not indicate that she uses a hearing aid or that her hearing loss affects her ability to work (AR. 41).  She testified that her jaw continues to frequently pop out of place (AR. 51).  Following the accident she also had surgery to place a shunt in the back of her head to relieve the pressure on her brain (AR. 50).  She takes Topamax daily to control her migraines, but approximately every three weeks she still experiences bad headaches that she successfully treats with Tylenol (AR. 42).

Nelson described having seizures approximately once every four or five weeks (AR. 40).  She has gone to the emergency room on occasion (AR. 41).  She indicated she was not currently on any anticonvulsant medications because the neurologist wanted to conduct another EEG and an MRI before prescribing any additional medications (AR. 41).  Nelson testified that since her accident she also suffers from dyslexia and is unable to tell left from right (AR. 46).  She is unable to read most things because they appear backward and worked for six months after the accident to learn to write her name correctly (AR. 52).

Nelson testified she experiences anxiety attacks during which she shakes, experiences paranoia, and feels as if she cannot breathe (AR. 46).  She stated the symptoms last  five to twenty minutes after she removes herself from the stressful situation that triggered the anxiety attack and can occur as often as several times a day (AR. 46).  She takes hydroxyzine three times a day to reduce the symptoms (AR. 46).  She suffers from severe insomnia and alternates between Ambien and Trazodone to treat it (AR. 50).

14

Nelson testified she has "phase two bipolar schizoaffective disorder" which is currently treated with Invega and counseling (AR. 40). She added that she would also start taking Geodon in addition to Invega (AR. 40). She described mood swings, with manic symptoms lasting a day or two during which she "run[s] around in circles," her mind "runs constantly," she is unable to focus, and is unable to sleep without medication (AR. 49). She described depressive symptoms lasting two days to two weeks, during which she stays in her house and does not want to be around anyone (AR. 49). Nelson stated her periods of depression have improved and last three or four days (AR. 49). Nelson described her schizoaffective disorder as hearing voices that are not there (AR. 51). "It's like being schizophrenic but they're not always there" (AR. 51).

Nelson testified that her "dissociate disorder" is the primary reason she is unable to keep a job (AR. 36). She described the disorder's effects as follows:

> Dissociate [sic] disorder causes your brain to slow down so you're almost like you have a hard time reading. That's when the voices in my head are the loudest is when I dissociate. You can't read real well, you get confused easy, you get scared easy and so it makes it very difficult to be around anybody that you don't know. . . . [Y]our mind is almost like you're a little kid and so it doesn't grasp all of the things that it normally would.

(AR. 36-37). Nelson stated she generally experiences the dissociative symptoms once every three months, lasting anywhere from a day to six weeks, but that because of recent changes in her dosage of Invega, she has been "in and out of dissociating for the last month" (AR. 37-38). She described hearing voices that are sometimes in the background "like there's a radio on" and at other times clearer, telling her to put her hands in grease or to wander off (AR. 38). Nelson testified she participates in counseling in addition to taking medication (AR. 38).

## C.  Vocational Expert's Testimony

The VE, Judith Najarian, appeared and testified she had reviewed Nelson's work history (AR. 53-54). The VE described Nelson's previous work as a fast-food worker as light work and unskilled; waitress as light and semi-skilled; sales attendant, self-service

store as light and unskilled; and cashier/checker as light and semi-skilled (AR. 54). The ALJ asked the VE to consider a hypothetical claimant of Nelson's age, education, and work background, who is limited to a light exertional level of work (AR. 55). The ALJ went on to describe the hypothetical claimant as having the following limitations: lifting and/or carrying twenty pounds occasionally, ten pound frequently; sit, stand and/or walk six hours out an eight-hour workday, with normal breaks; stoop or climb occasionally (AR. 55). The hypothetical claimant was further described by the ALJ with the following restrictions: must avoid unprotected heights and dangerous machinery, as well as concentrated exposure to loud noise and vibration (AR. 55).

The VE testified the claimant would not be able to perform any of her past work, based on these restrictions (AR. 56). The VE testified that at the unskilled, light exertional level, the claimant could work in the following positions: price marker with 7,334 jobs existing in the four-state region of Iowa, Nebraska, Missouri, and Kansas, and 149,764 jobs in the national economy; hand bander with 1,022 jobs existing in the four-state region, and 21,883 jobs in the national economy; and assembler, without a conveyor, such as a vacuum bottle assembler with 6,793 jobs existing in the four-state region, and 125,450 jobs in the national economy (AR. 56-57). The ALJ then asked the VE to consider the first hypothetical with the addition of mood instability causing the individual to miss work three times a month (AR. 57). The VE testified the individual would not be able to keep a job and there would be no other jobs available (AR. 58).

## THE ALJ'S DECISION

The ALJ concluded Nelson had not been disabled under the Act from August 2, 1998, through the date of the decision, and therefore is not entitled to disability insurance benefits (AR. 24). As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (AR. 10). **See** 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). These impairments must be expected to result in death or must last for a continuous period of at least twelve months. *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations. *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008); 20 C.F.R. § 404.1520(a)(4).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quotation omitted). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. **See** 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. **See** *Braswell*, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy. **See** *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. **See** *id*. at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted).

In this case, the ALJ followed the appropriate sequential analysis. Initially, the ALJ found Nelson meets the insured status requirements of the SSA through September 30, 2005 (AR. 12). The ALJ reviewed the record and determined Nelson has not engaged in any type of substantial and gainful work activity since August 2, 1998, the alleged onset

date (AR. 12). Next, the ALJ found Nelson has impairments considered severe under the Social Security regulations including: bipolar disorder, dissociative syndrome, history of cervical compression fracture and jaw surgery, seizure disorder, anxiety, and history of substance abuse (AR. 12). The ALJ further found Nelson has impairments that are considered non-severe including low back strain and hearing loss (AR. 13).

At step three, the ALJ found that Nelson's mental impairments, either singly or collectively, do not equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (AR. 13). The ALJ determined Nelson's mental impairments caused mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and "no clear evidence [Nelson] has experienced episodes of decompensation, which have been of extended duration" (AR. 13). Because Nelson did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ found the "paragraph B" criteria were not met (AR. 14). Similarly, the ALJ found the evidence did not establish the presence of "paragraph C" criteria (AR. 14).

The ALJ proceeded to determine Nelson's residual functional capacity (RFC) (AR. 14-22). The ALJ explicitly stated he considered all of Nelson's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (SSR) 96-4p and 96-7p (AR. 14). The regulations and SSRs cited by the ALJ list factors to consider when determining the claimant's credibility. The ALJ found that Nelson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment" (AR. 21). Specifically, the ALJ noted "it appears that many of [Nelson's] reports of difficulty actually involved drug seeking. It is difficult, if not impossible to separate fact from fiction" (AR. 21). "[I]ndications of exaggeration and drug seeking behavior diminish [Nelson's] credibility, as do some inconsistencies of record" (AR. 22).

18

In addition to the findings about Nelson's credibility, the ALJ considered the opinions of the professionals who evaluated and treated Nelson during the pertinent time period (AR. 17-22). The ALJ concluded there was no substantial conflict among the opinions in evidence (AR. 22). "None of the doctors has indicated that [Nelson's] physical or mental problems totally disable her for any and all of the jobs that exist in the national economy now that she has her addiction problem under control" (AR. 22). The ALJ gave substantial weight to the opinions of the state agency medical consultants, noting "recent information contained in [exhibits] confirm those opinions" (AR. 22). The ALJ acknowledged the relatively low GAF scores, ranging from 40 to 45, assigned by Dr. Jones, Ms. Kounvosky, and Ms. Decker, but determined those assessments were not reflective of Nelson's functioning over time as they were made at a time Nelson was abusing alcohol and had her children removed from her custody (AR. 22).

Based on the ALJ's consideration of the record, the ALJ found Nelson has the RFC to:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8-hour work day, sit 6 hours in an 8-hour work day, and occasionally climb and stoop. She must avoid hazards such as unprotected heights and dangerous machinery and must avoid concentrated exposure to loud noise and vibrations. She is limited to simple, routine work with no more that occasional public contact.

(AR. 14).

At step four, the ALJ found Nelson has no past relevant work (AR. 22). At the last step, the ALJ concluded Nelson could perform other work existing in significant numbers in the national economy (AR. 23). Therefore, the ALJ found Nelson is not disabled and has not been under a disability from August 2, 1998, her alleged onset date, through the date of the ALJ's decision (AR. 23-24).

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628

F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (alteration added). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007); *Nettles*, 714 F.2d at 835. Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (alteration added)).

## DISCUSSION

### A. Hypothetical Questions Posed to Vocational Expert

Nelson argues the hypotheticals posed to the VE were "legally inadequate" because (1) the ALJ omitted "the impact of pain sustained by the plaintiff in performing ordinary work and or household duties, the existence of pain was supported by the evidence"; and (2) the ALJ failed to include Nelson's "severe impairments of bipolar disorder, dissociative syndrome, anxiety, seizure disorder, sequella of cervical fractures impacting physical functional abilities." **See** Filing No. 28 - Brief p. 4. The court will address each of these arguments in turn.

20

### 1.    Plaintiff's Credibility

Nelson contends the ALJ erred in failing to include "the fact of pain sustained by the claimant on a frequent basis" and documented "over 11 times" in the records of Jill McAdam, PA-C, from Dr. States's office, in the hypotheticals posed to the VE.  **See** Filing No. 28 - Brief p. 8.  Prior to formulating hypothetical questions for the VE the ALJ must determine a claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility, in addition to considering the medical evidence and observations of physicians and others.  *Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008).  A court gives the ALJ deference in determining the credibility of a claimant's allegations concerning a claimant's limitations, where the credibility determination is supported in the decision.  *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, "even if every factor is not discussed in depth").  In evaluating subjective complaints, an ALJ is to examine objective medical evidence in addition to the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320,1322 (8th Cir. 1984)  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  These factors include:  (1) the claimant's day to day activities; (2) the duration, intensity, and frequency of symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  *Id.*  The ALJ, however, is "not required to discuss methodically each *Polaski* consideration."  *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ applied the correct legal standard in evaluating Nelson's credibility as to her symptoms and the effect, if any, those symptoms have on her ability to function.  In determining whether Nelson's complaints are credible, the ALJ must give reasons for discrediting the testimony and explain any inconsistencies found.  *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007).  In this instance, the ALJ engaged in a thorough analysis of Nelson's testimony and discredited Nelson pursuant to the applicable and appropriate criteria.  The ALJ noted the lack of medical evidence to support the severity of either the physical or mental symptoms claimed by Nelson (AR. 22).  Specifically, the ALJ noted the

absence of any medical opinions supporting her claims that she is totally disabled and unable to work due to her physical or mental problems (AR. 22). The ALJ noted Nelson reported having a seizure disorder, but was not on any medication for seizures at the time of the hearing (AR. 15). The ALJ also relied on the opinions of Nelson's examining or treating physicians that Nelson is "not a reliable historian or is a poor historian" (AR. 22). Further, the ALJ noted "indications of exaggeration and drug seeking behavior" and several inconsistencies in the record (AR. 22). The ALJ found inconsistencies between Nelson's testimony and statements she made to various treatment providers and evaluators (AR. 21-22). For example, the ALJ notes the inconsistency between Nelson's testimony she has not driven since her 2002 car accident and later admission of driving on one occasion that resulted in a DUI charge, with her written statement in her Supplemental Disability Report that she drove, but not very often (AR. 22).

The court notes additional inconsistencies in Nelson's statements made to various professionals regarding her history of drug and alcohol abuse, and her psychiatric diagnoses. For example, Nelson denied a history of recreational drug use in interviews with Dr. Kooken, Dr. Schroeder, Ms. Kounovsky, and Dr. Johnson (AR. 271, 446, 545, 553) but told Dr. Jones she was addicted to heroin at age fourteen (AR. 454). Nelson also endorsed inconsistent psychiatric histories. She generally includes dissociative identity disorder and bipolar disorder among her reported diagnoses but then denies bipolar disorder as a current diagnosis during her substance abuse evaluation in June 2007 (AR. 545). Nelson sporadically mentions PTSD (AR. 552), schizophrenia (AR. 598), schizoaffective disorder (AR. 454), and psychosis disorder (AR. 545), as her diagnoses.

The ALJ found Nelson "less than fully credible" "[c]onsidering her testimony in conjunction with the objective evidence and multiple statements of record" (AR. 22). On the other hand, the ALJ gave substantial weight to the opinions of the state agency medical consultants (AR. 22). Moreover, the ALJ specifically discussed his reasons for finding the opinions of Dr. Jones and Ms. Decker, which included significantly lower GAF assessments than that assigned by Dr. Schroeder, not reflective of Nelson's functioning over time (AR. 22). The ALJ noted several inconsistencies in Nelson's records and testimony which support the ALJ's determination that Nelson was less than fully credible. The ALJ properly

22

evaluated Nelson's credibility based on evidence in the record, including medical and psychological examinations and evaluations, and testimony.  Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony.  The record as a whole supports the ALJ's decision to discredit Nelson's testimony and subjective report of symptoms.

In any event, contrary to Nelson's arguments, the ALJ appears to give some consideration to Nelson's reports of pain and physical restrictions.  The hypothetical claimant described by the ALJ was restricted to light work and had other exertional and environmental limitations, including avoiding concentrated exposure to loud noise and vibration due to headaches (AR. 55).  Therefore, the hypotheticals presented to the VE were proper in this respect.

### 2.    Inclusion of all Impairments

Nelson contends the ALJ erred in failing to incorporate all of Nelson's severe impairments into the hypothetical questions posed to the VE.  **See** Filing No. 28 - Brief p. 4.  A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited.  *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001).  An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated."  *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001).  "Likewise, we have held that an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that [the] impairments significantly restricted [the] ability to perform gainful employment."  *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008).  "Moreover, the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments."  *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2001) (**quoting** *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996).

While the ALJ did not specifically name each of Nelson's impairments in the hypotheticals, the ALJ incorporated consequences of Nelson's determined impairments.

The ALJ included lifting, stooping, and climbing restrictions to address Nelson's history of cervical compression fracture; restrictions against unprotected heights and dangerous machinery to address Nelson's seizure disorder; and restrictions against concentrated exposure to loud noise and vibration in light of Nelson's reported headaches (AR. 55). In his second hypothetical, the ALJ included the limitation that the claimant would miss work three times a month due to mood instability (AR. 57). The court finds the ALJ included in his hypothetical questions those of Nelson's limitations the ALJ found to be supported by substantial evidence in the record as a whole. Therefore, the hypotheticals presented to the VE were proper.

**B.      Substantial Evidence - RFC**

Nelson argues the ALJ's RFC finding with respect to her limitations is improperly based on the ALJ's decision to equate Nelson's ability to engage in various household chores with Nelson's ability to engage in full-time competitive employment. **See** Filing No. 28 - Brief p. 4. Additionally, in the conclusion section of her brief, Nelson raises numerous additional arguments suggesting the ALJ erred in his determination of Nelson's RFC and the formulation of the hypotheticals posed to the VE. **See** Filing No. 28 - Brief p. 15. Nelson makes these brief arguments with cursory references to case law and no citations to the record in this case. **See _id._** While the court finds Nelson's arguments raised in this manner to be wholly inadequate, the following discussion of the ALJ's RFC determination addresses the points raised by Nelson.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." **_Lacroix_**, 465 F.3d at 887 (**quoting _Strongson v. Barnhart_**, 361 F.3d 1066, 1070 (8th Cir. 2004)). It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. **_Hurd v. Astrue_**, 621 F.3d 734, 738 (8th Cir. 2010). "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." **_Baldwin v. Barnhart_**, 349 F.3d 549, 556 (8th Cir. 2003); **see _Steed v. Astrue_**, 524 F.3d 872, 875 (8th Cir. 2008). "The ALJ bears the primary

24

responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." ***Vossen v. Astrue***, 612 F.3d 1011, 1016 (8th Cir. 2010).  While the ALJ has a duty to fully and fairly develop a record, he does not have to discuss every piece of evidence presented. ***Wildman v. Astrue***, 596 F.3d 959, 966 (8th Cir. 2010).  "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (alteration in original) (**quoting *Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998)).

"State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation.  Therefore, [ALJs] must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence." 20 C.F.R. § 404.1527(f)(2)(i).  While "there are circumstances in which relying on a non-treating physician's opinion is proper[,]" generally, "opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." ***Vossen***, 612 F.3d at 1016.  An ALJ does not err by considering the opinion of a State agency medical consultant along with the medical evidence as a whole. ***Casey v. Astrue***, 503 F.3d 687, 694 (8th Cir. 2007).

Contrary to Nelson's argument, the ALJ did consider evidence from Nelson's treating physicians.  The ALJ noted there did not seem to be any substantial conflict between the opinion evidence for the reason that "[n]one of the doctors has indicated that [Nelson's] physical or mental problems totally disable her for any and all of the jobs that exist in the national economy . . ." (AR. 22).  In fact, the record is void of medical source statements from any of Nelson's medical providers.  Furthermore, Nelson's contention that the ALJ determined Nelson's ability to engage in full-time competitive employment based on reports of her ability to perform some household chores is without merit.  The ALJ properly determined Nelson's RFC based on the evidence in the record and the ALJ's credibility assessments of the sources including Nelson, as discussed at length in the previous section.

The court finds the ALJ fully and properly evaluated the evidence in the record when determining Nelson's RFC.  While Nelson may be able to point to evidence that could

support a finding of disability, this court "may not reverse [the ALJ's decision] because substantial evidence exists in the record that would have supported a contrary outcome." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  That is, Nelson's RFC, as determined by the ALJ, is the product of the ALJ's responsibility to weigh and reconcile potentially conflicting evidence in the record and the dutiful fulfillment of that role is not to be overturned or superseded by the court.  20 C.F.R. § 416.927(c)(2); *McNamara*, 590 F.3d at 610.  Therefore, the court concludes that, having properly considered the evidence in the record, sufficient evidence supports the ALJ's findings with respect to Nelson's RFC.

## CONCLUSION

For the reasons discussed, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, does not contain the errors alleged by Nelson.  Substantial evidence in the record as a whole supports the ALJ's denial of benefits.  Accordingly, the Commissioner's decision is affirmed.  Reversal or remand is not warranted.

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the defendant will be entered.

DATED this 24th day of June, 2011.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.